IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY,
APPALACHIAN VOICES, and
THE SIERRA CLUB,

              **Plaintiffs,**

v.                               **Civil Action. No. 1:19-cv-00576**
                                       **Judge David A. Faber**

BLUESTONE COAL CORPORATION,

              **Defendant.**

## DEFENDANT BLUESTONE COAL CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Bluestone Coal Corporation submits this memorandum in support of its motion for summary judgment filed herewith.  The Court should grant this motion for the reasons stated below.

## BACKGROUND

The Ohio Valley Environmental Coalition and three other groups[1] brought this action pursuant to the "citizens suit" provision of the Federal Clean Water Act, 33 USC §§ 1251 et seq. and 33 USC § 1365, seeking civil penalties, injunctive relief, attorneys' fees and costs for selenium effluent limit violations of Bluestone Coal Corporation's (hereinafter defendant and BCC) National Pollution Discharge Elimination System (NPDES) permit issued by the state of West Virginia

---

[1] Hereafter collectively referred to as plaintiffs and OVEC.

Department of Environmental Protections (DEP).[2]

The effluent violations began in June 2018 and have continued form time to time.  More specifically, the selenium effluent violations occurred at outfalls 005, 006, 007 and 008 as identified on BCC's NPDES permit WV1006304, the permit for BCC's Red Fox mine in McDowell County, West Virginia.[3]

The permit required BCC to sample and test water discharges from outfalls 005, 006, 007 and 008 for selenium (and other substances) and to report results to DEP.  Under the NPDES regulatory regime the sampling and testing of permitted outfalls must be reported to DEP in discharge monitoring reports (DMRs), which BCC did.  Permit WV1006304 required BCC to sample, test and report numerical values for selenium, but the permit set no numerical value limit for selenium.  The permit, as to selenium levels, imposed a "report only" requirement.

WV DEP's selenium standards were changed so that, effective June 22, 2018, numerical limits applied to selenium discharges at Red Fox.  Since that time BCC has reported selenium discharges in violation of the new numerical permit limits.

Prior to the DEP change in selenium limits, BCC began to explore methods to achieve compliance, and has continued to do so.  However, BCC has not yet achieved compliance.

BCC does not deny the selenium effluent limit violations alleged in the Complaint.  BCC has, and continues to, determine and implement actions to stop the selenium violations.

_____

[2] The Surface Mining Control and Reclamation Act (SMCRA), 30 USC § 1270 contains a like citizens' suit provision for violations of SMCRA permits.

[3] The Red Fox mine was acquired in February 2015 by the owners of the Bluestone group of companies, when the prior owners, Russian nationals, sold them.  Red Fox mine is in idled status due to market conditions.  Deposition of Steve Ball, p. 36, attached as Ex. 1 to the Motion for Summary Judgment.

In enforcing compliance with selenium limits,(and parameters for other substances), DEP requires the permittee periodically to collect samples of the liquid effluent discharged from the pipe designated as a permitted outfall. The water emitted from the pipe is known as a "water column," and it is that water which is released into creeks, tributaries, or rivers. WV DEP allows an alternative method to testing the water column: semiannual studies of selenium found in aquatic life living in receiving streams. Commonly referred to as "fish tissue sampling," it is a method that actually measures selenium values within the bodies of fish and other organisms living in the streams receiving outfall discharges. In the Summer of 2019 BCC submitted a proposal to WV DEP and the United States Fish and Wildlife Service seeking permission to conduct such a study in the receiving waters for outfalls 005, 006, 007 and 008. Both agencies agreed, and so BCC collected small fish (to e.g., Blacknosed Dace, Creek Chub, Spotfinshiner) from the appropriate waters.[4] Following required scientific protocols, BCC collected fish in September and again in December 2019. WV DEP and US FWS personnel attended and observed the fish collections.

The collected fish were analyzed following the required protocols, and the results reported to DEP. Lab testing measures the bio-accumulation of selenium in the fish sampled. BCC believes fish tissue sampling to be a good measure of water quality, and the superior method for measuring the actual effects of selenium on living organisms. Test results proved that BCC would achieve compliance with selenium standards for outfalls 005, 007, and 008 under the fish tissue sampling approach. The data demonstrate that BCC could obtain modifications to permit WV1006304 by

---

[4] BCC had to secure US FWS permission for its proposed plan because waters in the area are home to the Big Sandy Crawfish, an endangered species. US FWS prohibited the company from electro fishing to collect samples. Rather BCC used conventional net, sein and block net methods to catch fish. Doss Depo. Pp 12, 17, 39.

3

substituting semiannual fish tissue values for the water column numerical limits in place since June 2018. BCC has submitted the fish tissue data to DEP in support of BCC's pending request for modification of the permit, as part of the renewal process for permit WV1006304.[5] Because the data establish the facts necessary to qualify for permit modification, we expect DEP to grant the modifications.[6]

Once the permit is modified, BCC must conduct fish tissue sampling, testing and reporting two times per year. If tissue results exceed allowed limits for selenium two or more over a two year period, then DEP will change the permit requirements for the relevant outfall; the change being from fish tissue analysis back to a numerical limit for samples taken from the water column of the outfall. Furthermore, this re-imposed numerical limit will be lower, and more strict, than the numerical value currently in the permit.

As for outfall 006, the fish tissue analysis showed values that comply with required values, but the reported values were close to mandated limit. Therefor, BCC has not requested a permit modification for outfall 006. Instead, BCC is considering other approaches to achieve compliance for outfall 006. These approaches all involve engineering applications, currently being studied by the company, and include:

1.      The installation of a biocell and

2.      Various water management techniques.

A biocell is best described as an open impoundment, on the land's surface, which would receive the

---

[5] Attached to the summary judgment motion are reports of fish collection and testing, Ex. 2 for September 2019 collection and Ex. 3 for December 2019 activity.

[6] Permit requirements are not within DEP's discretion. If requirements are met, DEP will issue the requested changes. Doss, Ex. 4 at pp. 29-30, 47-48.

water coming from outfall 006, and which contains organic materials such as horse manure and hay. Biological organisms live in the biocell, and they act upon the selenium and reduce selenium to compliant levels prior to discharge into a receiving water. BCC has not yet determined whether a biocell can be built to serve outlet 006, due to topology of the relevant site, and other considerations.

Water management solutions generally include pumping outfall 006 water (1) up the mountain to reclaimed areas of the surface mine to be sprayed on the ground (2) pumping to other ponds and (3) underground injection. Doss, Ex. 4, pp. 119-140. These are techniques allowed under the CWA and SMCRA.

## THE FEDERAL CONSENT DECREE

BCC is subject to a Consent Decree entered December 19, 2016, in United States, et al. v. Southern Coal Corporation, et al., Civil Action No. 7:16-CV-00462 (GEC) (W.D.Va.) (Filed in this case as Doc. 8-1 (Ex. 1 to defendant BCC's Motion to Dismiss, Doc. 8, filed September 25, 2019). Although BCC is not a named defendant in the Consent Decree, it nevertheless is subject thereto as an indirect subsidiary of named defendant Bluestone Resources, Inc. and because BCC shares common ownership with all parties-defendant to the CD, *See* CD, Doc. 8-1, ¶14.dd.[7]

The Consent Decree was the product of two years of good faith, thorough going negotiations between Southern Coal Corporation (SCC) affiliates, the United States Department of Justice (DOJ), the United States Environmental Protection Agency (EPA) and the states of Alabama, Kentucky, Tennessee and Virginia, and involved participation of senior DOJ and EPA officials, as well as the offices of the Attorneys General and regulatory agencies of the four states. The CD also applies to

---

[7] BCC hereby adopts and incorporates its Motion to Dismiss Doc. 8, and Memorandum in Support, Doc. 9, in this Motion for Summary Judgment.

mining facilities in West Virginia.[8] SCC and its affiliates were thoroughly vetted with respect to their mining operations, facilities, and financial affairs and status. DOJ and EPA had mining and environmental regulators and consultants, as well as highly qualified financial consultants, examine SCC's affairs and status. Meetings of the parties and their counsel were held in Washington, Roanoke and Charleston.

Negotiations were concluded in September 2016. The CD was lodged with the Court in Roanoke on September 30, 2016, along with the governments' Complaint. Notice of the proposed Consent Decree was published in the Federal Register, and the public was allowed a 30 day comment period. In December 2016, DOJ filed a motion asking the Court to enter the CD, stating that "the settlement process was fair and well-informed," "was designed to achieve CWA compliance," and will provide widespread environmental benefit. Doc. 8-5. DOJ stated that the CD "is forward-looking, [and] contains multiple frameworks for bringing defendants into compliance." Id. Judge Conrad entered the CD December 19, 2016. The Consent Decree was a "final judgment" over which the Court retains continuing jurisdiction until the CD terminates.

The Consent Decree applies to all SCC and affiliates coal mining facilities and operations in five-states. Stated differently, the CD applies to all SCC coal mining facilities and operations. Major components of the CD: include: injunctive relief: including development of an environmental management system, internal and public facing data system audits, outlet inspections, systems for violation response, engagement of environmental management system auditors and treatment system auditors, outlet sampling and pond protocols and verification, compliance database, filing of verified

---

[8] The state of West Virginia initially participated in the negotiations, but withdrew in 2015, and is not a party to the CD.

reports, training for employees and vendors, creation of an environmental system manual, and other mandated actions.

SCC was required to obtain EPA approval of third party vendors, and of course reporting audits and actions to EPA. The CD established levels of financial civil penalties for violations of the wide variety of mandatory requirements. SCC must file certified quarterly reports that list violations of CD injunctive provisions, violations of state laws and permits, and response actions. Stipulated penalties for each quarter are paid to the Unites States and states when the quarterly reports are submitted.

Defendants have paid approximately $280,000 in stipulated penalties for the selenium effluent violations at Red Fox mine that are alleged in the Complaint. They have reported and paid additional stipulated penalties for violations occurring after June 30, 2019.

SCC paid a $900,000 civil penalty – up front – per the CD. The governments acknowledged that they agreed to such a sum due to the companies' limited and constrained financial situation. CD, ¶¶ I.c. and 20.

The CD applies to BCC and all its affiliates, over 25 separate but affiliated coal companies located in five states. Many of those companies hold CWA and SMCRA permits, covering approximately 2,261 permitted outfalls. The governments, through the CD, have in fact increased and enhanced compliance. The CD is capable of continuing to achieve even greater compliance.

In summary, the CD provides the DOJ, EPA and sates "multiple frameworks" and "many mechanisms" to achieve compliance. In fact, an EPA official noted the increased compliance by SCC since negotiations began in 2014 until December, 2016, Affidavit of Ms. Ireland, EPA Doc. 8-6.

7

### BCC WILL ACHIEVE COMPLIANCE AT THE RED FOX MINE

Four Red Fox outfalls are subject to this case: 005, 006, 007 and 008. BCC has (through qualified vendors) conducted fish tissue testing, which provides an accurate measure of the cumulative effects of selenium discharges on aquatic organisms. The study results demonstrate that outfalls 005, 007 and 008 are in compliance with WV DEP's selenium aquatic life standards. Doss, p32. BCC has supplied WV DEP the data necessary and sufficient to secure modification to its permit WV1006304 for outfalls 005, 006, and 008, in its currently pending permit renewal process.[9]

The Federal Court retains jurisdiction of the Consent Decree, which will remain in full force and effect until such time as the companies have completed all actions required by the injunctive relief provisions, and "have thereafter maintained consistent satisfactory compliance with [the] Consent Decree for an additional period of three years[.]" CD, XIX Termination Provision, ¶¶137-139.

### ARGUMENT

The Court should grant BCC summary judgment on the same basis that supports BCC's motion to dismiss, Doc. 8, 9: that is, this action is precluded by virtue of the citizen suit provision of the CWA, 33 USC § 1365, which provides in pertinent part:

(a)     Authorization; jurisdiction

Except as provided in subsection (b) of this section and section 1319 (g)(6) of this title, any citizen may commence a civil action on its own behalf –

---

[9] The study inferentially demonstrates that BCC likely was in compliance with fish tissue standards and water quality standards for outfalls 005, 007 and 008, between June 2018 and thereafter, and so would not have incurred violations under the fish tissue alternative to numerical numbers from water column measurements.

1.     against any person (including (I) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the Eleventh Amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, . . .

(b)    Notice; no action may be commenced –

1.     under subsection 1365(a)(1) of this section – . . .

(B)    **if the Administrator [of the U.S. EPA] or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States**, or a State **to require compliance with the standard, limitation, or order**, but in any sch action in a court of the United States any citizen may intervene as a matter of right. (emphasis added)

The Consent Decree is the product of a civil action brought by the United States, in a court of the United States, to comply with the standards and limitations of BCC's (and other commonly owned coal operations) CWA permit WV1006304 and WV SMCRA permit WVS007282.[10] The Complaint initiating the suit was filed September 30, 2016, and therefore prior to filing of the instant action. SCC and its affiliates have paid millions of dollars in stipulated penalties so far. SCC and affiliates, moreover, have addressed a multitude of compliance matters in striving to, and often achieving, full compliance. Much of that activity was completed without the need for court intervention, but rather

---

[10] *See* 30 USC § 1270 (b)(1)(B).

by the companies, the states, DOJ and EPA discussing and resolving issues as they arose.  Progress

was achieved before the Consent Decree was entered (*See* Ireland), and progress, but not perfection,

has continued since.  The CD required SCC to pay approximately $280,000 in stipulated penalties

for the exact selenium effluent violations listed in plaintiffs' Complaint, covering the period of July

2018 through June 2019; and additional stipulated penalties have been paid since then.  These

violations and penalty payments are posted on-line at the public access website established per the

CD.  Overall, the actions of the EPA Administrator in connection with Red Fox have, as a matter

of law, constituted "diligent prosecution."

In Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, 484 U.S. 49 (1987) the court

noted "that citizen suits are proper only if the Federal, State, and local agencies fail to exercise their

enforcement responsibility, id . . . (quoting S. Rep. No. 414, 92d Cong., 1ˢᵗ Sess. 64 (1971)." (internal

quotes, citations omitted.) (quoted by Judge Chambers in Ohio Valley Environmental Coalition v.

Consol of Kentucky, *3, 2014 WL 171938 (2014) (unpublished)).[11]

The question of diligence should be considered in the context of the regulatory framework

within which the question arises.  The CWA was enacted as the Federal Water Pollution Control Act,

in 1972.  The key component of the CWA is the NPDES permitting program.  EPA has authority to

issue NPDES permits, but primary authority for the program can be delegated to states with EPA

retaining oversight of state programs.  This system has been described as "cooperative federalism."

The grant to citizens to sue for certain violations further aids CWA compliance.  As plaintiffs allege,

in West Virginia the NPDES program has been delegated to the state.  Complaint ¶19.  To these

_____

[11] Beginning with the citation to Gwaltney, the legal argument closely follows the
argument set forth in BCC's Memorandum of Law in Support of its Motion to Dismiss, with
only very minor changes Doc 9.

layers of regulation and enforcement Congress added the citizen suit provisions of the CWA *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC) Inc.*, 528 U.S. 167, 174 (2000); *Friends of the Earth, Inc. v. Gaston Cooper Recycling Corp.*, 204 F3d 149, 152 (en banc); *Piney Rune Preservation Association v. The County Commissioners of Carroll County, Maryland*, 523 F3d 453 (4th Cir. 2008). The citizen suit provision has been described as "critical" to CWA enforcement; but such suits are intended "to supplement rather than to supplant governmental action." *Piney Run*, *supra* at 456, citing *Gwaltney* at 62. To that end, subsection 1365(b)(1)(B) bars a citizen suit where EPA or a state has commenced an action that is being diligently prosecuted. This issue "is normally determined as of the time of the filing of a complaint." *Piney Run*, at 456, citing *Chesapeake Bay Foundation v. American Recovery Co.*, 769 F2d 207, 208 (4th Cir. 1985).[12]

In *Piney Run* the court expressed the rules that govern the instant case. "A CWA enforcement prosecution will ordinarily be considered "diligent" if the judicial action "is capable of requiring compliance with the Act and is in good faith calculated to do so and diligence is presumed." *Piney Run*, *id.*, quoting in part *Friends of Milwaukee's Rivers v. Milwakee Metro. Sewage Dist.*, 382 F.3d 743, 760 (7th Cir. 2004), *cert. denied*, 544 US 913 (2005). The court also quoted *Karr v. Hefner*, 475 F3d 1192, 1198 (10th Cir. 2007) "Citizen plaintiffs must meet a high standard to demonstrate that [a government agency] has failed to prosecute a violation diligently." The Fourth Circuit further addressed such suits in *Piney Run*:

> Section 1365(b)(1)(B) does not require government prosecution to
> be far-reaching or zealous. It requires only diligence." *Karr*, 475

---

[12]Activities by the EPA and by the alleged violator, occurring after the complaint is filed, may render the citizens' suit moot, thus eliminating the court's jurisdiction. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envmtl. Services, Ltd.* 528 US 167,189(2000); *Ohio Valley Environmental Coalition v. Hobet*, 723 F. Supp 2d 886 (S.D.W.Va. 2010).

11

F. 3D at 1197.  Thus, a citizen-plaintiff cannot overcome the presumption of diligence merely by showing the agency's prosecution strategy in less aggressive than he would like or that it did not produce a completely satisfactory result. *Id.* Moreover, the fact that an agency has entered into a consent decree with a violator that establishes a prospective schedule of compliance does not necessarily establish lack of diligence.  *See* Weinberger v. Romero-Barcelo, 456 U.S. 305, 318, 102 S.Ct. 1798, 72 L.Ed. 2d 91 (1982) (noting that "enforcement actions typically result, by consent or otherwise, in a remedial order setting out a detailed schedule of compliance designed to cure the identified violation of the Act" (internal quotation marks omitted)).  Indeed, when presented with a consent decree we must be particularly deferential to the agency's expertise, and we "should not interpret § 1365 in a manner that would undermine the [government's] ability to reach voluntary settlements with defendants." Karr, 475 F.3d at 1198. As the Supreme Court has recognized: "If citizens could file suit . . . in order to seek the civil penalties that the Administrator chose to forgo, then the Administrator's discretion to enforce the Act in the public interest would be curtailed considerably." Gwaltney, 484 U.S. at 61, 108 S.Ct. 376.

Applying the above judicial principles, the Fourth Circuit ruled that a consent decree entered between the Maryland Department of Environment and the alleged violator, the Carroll County Commissioners, precluded the citizen suit.

District courts in West Virginia have addressed the question of diligence in citizen suits against coal companies. *See, eg.* Ohio Valley Environmental Coalition v. Hobet Mining, LLC, 723 F. Supp 2d 866 (S.D.W.Va. 2010) (finding no diligent prosecution by WVDEP, based on its poor enforcement, compliance schedule and penalty imposed) (Judge Chambers); Sierra Club v. ICG Eastern, 833 F. Supp 2d 571 (N.D.W.Va. 2011) (finding citizen suit barred because WVDEP had commenced an enforcement action in state court that was pending when the citizen suit was filed, and which resulted in a consent decree between WVDEP and the company, but which had not yet been approved by the state court, and concluding the WVDEP's prosecution was diligent) (Judge

12

Bailey).

Here, plaintiffs may not approve of EPA's enforcement strategy, or the terms of the CD. Nevertheless, under the CD, the EPA (and Bluestone) are capable of achieving compliance with the CWA, and the CD is calculated to do so. Piney Run, *supra*.

If this Court holds that EPA is not diligently prosecuting the enforcement action, then the relief OVEC *might* obtain includes civil penalties, but only for (1) ongoing effluent limitation violations and not past violations, *See* Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167 (2002), which additional penalties must be paid to the United States; (2) injunctive relief; and (3) attorney fees and costs, 33 USC § 1365(a).  Such a situation would require this Court to: (1) determine the amount of civil penalties Bluestone would pay *in addition to* stipulated penalties under the CD; (2) fashion some type of injunctive relief, *in addition to* the injunctive relief already in force under the CD; and (3) order payment of attorney fees and costs.  The result likely would be undue interference with the court across the state line in Virginia, possibly conflicting rulings, and an unwarranted investment of judicial resources. The result would also drain funds from Bluestone (and its affiliates; e.g. civil penalties, legal fees) which are very much needed by Bluestone for its efforts to achieve greater compliance.[13]

## CONCLUSION

The facts proving diligent prosecution by the United States are clear; therefore this action is precluded by §1365 (b)(1)(B), and BCC is entitled to judgment as a matter of law.

---

[13] Defendant does not herein recite the standards applicable to Rule 56 as counsel believe this Court is well aware of Rule 56 and relevant case law.

Respectfully submitted,

BLUESTONE COAL CORPORATION,
By Counsel:


_____/s/ S. Benjamin Bryant_____
Michael W. Carey, WVSB No. 635
S. Benjamin Bryant, WVSB No. 520
Carey, Scott, Douglas & Kessler, PLLC
707 Virginia Street, East, Suite 901
P.O. Box 913
Charleston, WV 25323
(304) 345-1234
mwcarey@csdlawfirm.com
sbbryant@csdlawfirm.com

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
BLUEFIELD DIVISION**

**OHIO VALLEY ENVIRONMENTAL
COALITION, WEST VIRGINIA
HIGHLANDS CONSERVANCY,
APPALACHIAN VOICES, and
THE SIERRA CLUB,**

               **Plaintiffs,**

**v.**                                   **Civil Action. No. 1:19-cv-00576**
                                              **Judge David A. Faber**

**BLUESTONE COAL CORPORATION,**

               **Defendant.**

### CERTIFICATE OF SERVICE

    I, S. Benjamin Bryant, counsel for Bluestone Coal Corporation, do hereby certify that on May 8, 2020, I electronically filed the foregoing **"Defendant Bluestone Coal Corporation's Memorandum of Law in Support of its Motion for Summary Judgment,"** with the Clerk of the Court using the CM/ECF system, which will send notification of such filings to the following CM/ECF participants:

Derek O. Teaney, WVSB No. 10223
J. Michael Becher, WVSB No. 10588
Elizabeth A. Bower, WVSB No. 13583
Appalachian Mountain Advocates
P.O. Box 507
Lewisburg, WV 24901
(304) 382-4798
dteaney@appalmad.org
mbecher@appalmad.org
ebower@appalmad.org

James H. Hecker, DCSB No. 291740
**Public Justice**
1620 L Street, NW Suite 630
Washington, DC 20036
(202) 797-8600 EXT. 225
jhecker@publicjustice.net



  /s/ S. Benjamin Bryant
S. Benjamin Bryant, WVSB No. 520